We'll hear United States v. Waterman. May it please the court, Sean Weed for the United States. If I may, I would like to reserve three minutes of time for rebuttal. Granted. When Wilmington police officers responded to a house with a report of a man armed with a gun at that location. It looks like the normal protocol would be when they got out of their cars, why did they pull their guns so quickly? Your Honor, I believe that they And tell people to, in effect, stop. I mean, that seems like it was an overreaction. Your Honor, I believe why the officers were so quick to order everyone to put their hands in the air was partially due to the circumstances of it being literally a dark and stormy night. When they were driving to that location, it was extremely dark. The officers had to use their vehicle spotlight, in fact, to find the direct address where the individuals were located. And when they initially came upon that house, all they could see were five silhouettes. Is that enough under the law? Your Honor, the government concedes that at the moment when the officers attempted to stop the defendant, that that was not enough for a Terry stop under the law. But it seems like they overreacted. I mean, maybe they were scared. I don't know. Your Honor, I would point to the circumstances. I believe the officer actually said specifically in terms of what her feelings were at the time was one of the questions that was asked of her on cross-examination was, well, why didn't you simply just go up to the defendant in this case? And what Officer Ash responded was, look, on that type of a call, in those circumstances, I'm not going to do that. And presumably, she was, in fact, scared based on there being a report of a person with a gun. But isn't what usually happens is one officer walks up to the five people on the porch and another officer stays back, in effect, as protection? Your Honor, I don't believe, just from my own personal experience, I think that certainly does happen. I don't know if that's in the record as far as being the typical protocols that Wilmington Police Department follows. Why was the court wrong in saying there was an unlawful Terry stop, and therefore, everything falls away? It was a bad arrest, et cetera, et cetera. Your Honor, basically, it goes to an application of California v. Hodarity. Your Honor, the government's position is Hodarity and this court's precedent is interpreting that opinion is pretty clear, that where you have an officer's show of authority, which again, the government concedes was, happened in this case, when the officer said, all right, let everyone put your hands in the air, let's see your hands, there also needs to be a submission or a yielding to that authority. So if he had put his hands up, there would have been a Terry stop? Yes, Your Honor. But as it was, he stood there, he had his hands in his pockets, he moved them to his and he's standing there for, do we know how long? Your Honor, the record is not entirely clear about exactly the time period that he was standing there. It's clear that as far as how the events unfolded in that case is that you're exactly right, Your Honor, he had his hand behind his back, was trying to open the door, still had his hand on his waistband. Now, he didn't want to be there, probably, but he was there. Is submission a physical act, or a mental act, or are we supposed to slice it that thin? Your Honor, I think that it's certainly what I would say, based on the opinions, it's clearly a fact-intensive legal inquiry. It's clear that the Mendenhall test is an objective inquiry as far as whether or not a person in the defendant's position would feel free to otherwise terminate the encounter. Yeah, how about that? With the guns blaring, et cetera, et cetera? Certainly, and Your Honor, again, there's no question, even at the, certainly at the moment that the officers had their firearms raised, I think it's clear that they were compelling action. An objective person would certainly take that to be the case. Now, is that sufficient physical force to substitute for submission? Your Honor, raising a firearm, if I may, Your Honor, raising a firearm at an individual is not an application of physical force. It's a, it's certainly a show of authority, and to that degree, a much more extreme one, than simply saying, put your hands up. If I may, the court here addressed a similar, analogous situation, United States v. Samuels. That's an unpublished disposition, but it's cited in the government's reply brief. Specifically, the case there was, officers approached an individual who was making what they believed to be furtive movements towards his waist, and they ordered him, at gunpoint, to raise his hand. And the defendant there failed to comply. In fact, he actually raised one hand, which is not what the defendant should hear at all. Was that saying hello? Saluting? But they found that, the court found that he was not seized, because he'd not submitted to the officer's show of authority. Again, another situation would be United States v. Johnson, which is a D.C. Circuit case, but one relied upon heavily in United States v. Valentine. There, the situation was, officers were approaching a vehicle. The defendant there was, again, making similar type of furtive movement with his hands, and the officers raised their firearms, pointed it at the defendant, and said, get your hands up, let's see your hands, to which the defendant refused to comply, and therefore, was not seized under the BIDAR-ID analysis. As a practical matter, how does the decision that we would make here help inform police activity going forward? The ruling you want from us, and indeed you say is compelled by HODAR-ID, is that, but for the fortuity of Mr. Waterman's declining to raise his hands, this encounter would have come to an end, or any evidence associated would have been Is there any way to encourage the police to not make unreasonable stops, as the government concedes was the case here, while applying the rule you want us to apply? Your Honor, I think that in terms of explaining to this particular officer, in terms of a deterrent factor, which is one of the primary purposes of the exclusionary rule, I believe simply pointing out in the opinion that the officers did not have a reasonable suspicion to make a stop would be enough to inform this officer that in a future situation where she has an anonymous tip, in a situation like that, it's not enough for her to stop, and you need some form of corroboration. But I think what's important in terms of a policy standpoint, which is obviously on the Court's mind here, what HODAR-ID referred to in the situation was, look, we also have this countervailing policy, and that's to make sure that individuals are complying with the police command. And when we consider the possibility that you have individuals who are simply going to shirk what an officer tells them to do, and thereby possibly create a much more dangerous situation, HODAR-ID was a police chase. In this case, it was officers having to draw their weapons, and an individual fleeing into a house. That would trump, essentially, the policy underlying the exclusionary rule, which is to teach the officers a lesson in terms of what to do and what's appropriate in a particular circumstance. Is that what submit means? I mean, is that – that's an interesting policy argument, that suppression really isn't going to benefit people who don't submit to authorities. Is that found in the case law? I was simply referring – That we're going to draw a line because we don't want defendants who don't comply with peace directives to be getting the benefit of the – I think – I think that my point is perhaps taking HODAR-ID a step further, but HODAR-ID definitely makes the point of, yes, we want to encourage people to comply with officers' orders, thereby avoiding situations where, you know, there's police pursuit, et cetera, that type of a thing. Or does submit – I mean, the difference seems to me, if someone is fleeing, and they have never come to a stop, there cannot be a stop. So that the concept of submit might be that they are at least stationary as compared to moving. Any case law shed light on what submission means? Your Honor, I would point the court to United States v. Brown, one of the more recent decisions discussing a HODAR-ID. In that case, the – an individual was – I'm pretty familiar with the case. I know Judge Ambo is very familiar with the case. In that particular case, the defendant in particular was asked to submit to a pat-down search. Right. And the court there found that he had actually submitted by doing what the officers had told him to do, which was to turn and place his hands over towards where the car was, where he would be submitting to that pat-down search. And I think that in answer more directly to Your Honor's question, it's always going to be a contextual answer. Submission to stop in the name of the law is clear. It's stopping. Here, I believe the answer was likewise as clear because the answer was, you know, put your hands in the air. Four out of the five people on the porch put their hands in the air. The answer was pretty clear about exactly what yielding or complying or submitting to All right. Thank you. We'll hear from you on rebuttal. Good morning. Brian Crockett for the defendant, Christopher Waterman, in this case. A couple of facts at the outset. Mr. Waterman, he did not live at 1009 West 7th, did he? He did not. That was a girlfriend's house. He was there for Mother's Day. His children, he had children with this woman and he was there celebrating Mother's Day with the family. Now, Willie Waters, the brother of DeRay Waters, did he live there or was he just, said he was there once or twice a week? What does that mean? Mr. Waters claimed to the police on that day that he lived there. And you're not disputing on appeal, are you, that the police could have relied on that in good faith, are you? No, Your Honor. We're not. Not on appeal. Because your argument is it all stops and falls apart with put your hands up, right? It all stops and falls apart prior to consent being given. The district court didn't consider Hodari. In her opinion, she didn't go into that. I think the district court is correct in that aspect. Hodari deals with cases where we have a fleeing felon or a felon that is overtly disregarding. But it also defines when a seizure takes place. Isn't seizure sort of the scenic one on here? I think it is, Your Honor. I think, however, a seizure takes place. The district court correctly noted that a seizure took place. In this instance, because Mr. Waterman was in a position where, one, he did not overtly disregard the officer's commands. Oh, come on. Let me be clear on that. Perhaps I was inartful in saying that. By distinguishing this with the facts in the Hodari v. Valentine and the Johnson case that the government cited, in Hodari v. we have a situation where the defendants were running away from the police officers, an overt act of disregarding the commands. In Valentine, we have a situation where the defendant was making furtive gestures, aggressive, furtive, perhaps defensive gestures. But here, was there a submission to the assertion of authority? Did he say, when they said, put your hands up, did he put his hands up? I think he acquiesced to the officer's commands. He may not have. How can you say that when four out of five people understood that means this? And his, you know, whether you want to characterize it as aggressive furtive movements or not, the record appears to be clear that his hands were behind his back, messing with his waistline and reaching for a doorknob, actions which certainly were understood by the police officer to be aggressive in the sense that maybe he's reaching for a gun. After all, I'm here on a call about a gun. But certainly not submitting to authority. Well, if I may, the record, the officer goes back and forth in their testimony about what the exact commands were. In some instances, she says, we told them to show their hands. In some instances, she says, we told them to raise their hands. Well, he didn't do either. Well, he did show his hands. On cross, and it's- That's not what the district court says. I mean, aren't we bound by the district court's findings here? The district court finding, in her opinion, seems pretty clear that four out of five, that the command is hands up or words to that effect. Four out of five comply. Your client doesn't. The command is given again. He still doesn't. The command is given withdrawing guns. He still doesn't. The door opens. He flees. And it's only after he's run away, and by his later admission, secreted the gun in the house, that he comes out with his hands up. That's the record that the district court's finding puts before us, right? Which we're bound to, absent clear error. That's correct. However, I think the district court also notes, in a footnote, footnote four, I believe. She casts some doubt, perhaps, on the government's recitation of facts, because she also talks about the testimony of Trey Waters, who testified in somewhat stark detail, a very different scenario than what the government presented at the suppression hearing. But she never resolves that conflict. Do we need to remand this for fact-finding as to whether there was a submission? Your Honor, there may be an option that this court would consider. Given the court's recent decision, United States v. Crandall, I think procedurally this case is very similar to the Crandall case. How so? Well, in Crandall, we also had a situation where, and let me back up and say that the Crandall case, the district court opinion, was cited in our motion to suppress below. The district court cited the Crandall case. And its opinion, and I think the district court relied on the structure of the Crandall in coming forward with this opinion. Well, we did a different structure in our case compared to what the district in New Jersey did. That's correct. And again, the key, the scenic one on there as well is, was there a seizure? So how is this case similar to Crandall? I think given the credibility issue that the court raises in footnote four. I'm not finding footnote four. Footnote four, which is relatively early. It's page four or three. It's page three. Oh, okay, page three, yeah. It talks about the dispute as to when the spotlight came in and Ms. Waters' behavior. Action, yeah. How does that cast any doubt on the sequence of events, which is crucial here, and that's hands up, don't comply, hands up, don't comply. If I got my gun out, hands up, don't comply. Yeah, she said Ash ordered everyone to put their hands in the air. I think Ms. Waters goes on in her testimony and talks about the fact that they were on their way into the house, and at some point she even said that we were in the house. So I'm not saying that the court would believe entirely Ms. Waters' recitation of facts, nor entirely the government's recitation of facts, but a combination of those would lead to a seizure if in the event the court finds that Mr. Waterman was in the house, the police come to the scene, tell them to come out, and Mr. Waterman complies with that order. At that point I think we have a seizure. At this point they show up. There's five people on the porch. Testimony is that he's one of the people on the porch. They tell them to put their hands up, and he does not comply. Indeed, not only does he not comply, he keeps moving back toward the door, and then once I think Deborah Waters opens the door, he runs in the house. Your Honor, I don't recall that he was backing up. I recall that he was standing in front of the door, and he... Why don't we just put it right on the record right here from Judge Robinson's findings of fact. She, meaning Ash, ordered them to put their hands up in the air for safety reasons. Everyone complied except the defendant, whose hands were inside his jacket pockets. That's paragraph six. Next, Ash did not see a weapon in the defendant's hands. However, based on her training, she suspected the defendant might have been armed because he had moved his hands toward his waistband. Going down a little further, the defendant... Oh, it says again... Never complied. She repeatedly commanded the defendant to put his hands in the air. The defendant did not comply. He moved one of his hands behind his back, turned the doorknob of the front door, etc. Those are factual findings. I don't know any other way to read it except factual findings that tell us what the sequence of events was. So if that is indeed what we're bound to, unless it's clearly erroneous, that takes me to the Hodari D question that your opponent has raised. How is it either a submission to authority or an example of physical force which obviates that submission to authority prong for the defendant to have done what he did here and therefore have the benefit of the exclusionary rule that you're arguing for? I think that two reasons. One, the police officers drew their weapons at the outset. The second reason is... But that's not physical force. I mean, if it's Mendenhall, you've got an argument, but Hodari D is what we have to look to. I think it is the most extreme act of force a police officer can take absent actually laying their hands upon an individual. And Hodari D says it's either a laying of the hands or an application of physical force. There is a distinction between this actual physical contact and an application... Well, it says a seizure requires either physical force, dot, dot, dot, or where that is absent, submission to the assertion of authority. And perhaps I misquoted. In Brown, this court says a laying on of hands or application of physical force to restrain movement. But there there was physical. I mean, there there was the laying of hands. Where's the laying of hands here? I guess what I'm concentrating on is the application of physical force to restrain movement. There was no laying of hands here. That's obvious, Your Honor. You're reading the word or in Brown not as a clarification of what physical force means but as an alternative. I think Orr notes alternative here. Yes, yes. And I think that the drawing of the weapons is a remote application of physical force in this situation. Especially considering that Mr. Waterman's avenues of escape at that point were all blocked. The police officers were standing in front of him. The porch was very narrow, very small. The door behind him was locked. You're not suggesting that he was submitting to authority, are you? I mean, that seems clearly clear that he was not submitting to authority. Repeated commands elicited not compliance but continued disregard and continued effort at escape, which he finally succeeded at thanks to somebody opening the door from the inside. I think that at that moment. Doesn't your argument have to be the physical force one? How can you win on submission to authority? Oh, I don't think we can clearly win on submission to authority other than to say that at the point that the police threw their guns, the door was locked, all avenues of escape were blocked, he came to the realization, and a reasonable person comes to the realization that, one, he was not free to leave, and two, he was not free to disregard the officer's orders. Well, now when you say he was not free to disregard the officer's orders, I'm puzzled because he did disregard the officer's orders. When you say he wasn't free to do it, he was doing it. That is exactly what he was doing. In the face of repeated demands that he raised his hands, he was not doing it. So when you say he concluded he wasn't free, how does that square with his actual behavior on the scene? I think that was subsequent to the moment of seizure, and once we find the moment of seizure, things that occur subsequent to that are disregarded. That was subsequent. Wait a minute. When was the moment of seizure here then? I think the district court was correct in saying that when the officers repeatedly commanded him to show his hands, raise his hands in the air. But as I said, maybe under Mendenhall that's a good argument, but under Hodari D., which is the later case of the Supreme Court, how do you square this with Hodari D.? Coupled with the drawing of the weapons and the realization that— That drawing of the weapon, Mr. Craig, that happened after he repeated verbal warnings without weapons drawn to raise his hands, right? So is it a seizure when they say, hands up, and he doesn't comply? Or is it a seizure when they pull their guns later and say, hands up, and he still doesn't comply? When does it hit? I think the seizure hits when the officers apply the show of force through the drawing of the weapons. I think the seizure hits when it becomes apparent to Mr. Waterman that he has no avenues of escape at this point. And the door is locked behind him. His way is blocked in front of him. I think this is akin to the Johnson v. Campbell case. Johnson v. Campbell is when did you have a seizure, not did you have a seizure. This case is did you have a seizure. I mean, Johnson, very different facts. I think Johnson is instructive in the situation where Johnson, like Waterman,  was in an enclosed area in his car with no avenues of escape. Johnson didn't roll down his window initially. I mean, the facts are quite different here. Here's somebody being told to submit to authority, and he does not. Then the question becomes, was there physical force applied to him? And it doesn't appear that there was. Now, the argument you make, which is maybe for a higher court, is that the drawing of guns is, in effect, the equivalent of the laying of physical force. But that's not the law before us. Your Honor, I think that in this case it's appropriate for remand for further factual findings. But, I mean, as Judge Jordan said, the factual findings here seem to be pretty detailed. I think they're conditional, though, given the questions raised in footnote four about the credibility of the government. To flip that, isn't there really an argument that there was a misunderstanding of when there was a seizure here by the court? That's a matter of law. I'm sorry? A misunderstanding by the district court as to when the seizure took place. That's not a finding of fact. That's a matter of law. I think, though, it must be. I think the court should be given the opportunity to, by assessing the credibility. But did the court cite Hodari-D? Did the district court cite Hodari-D? No, it did not. It did not. No? And if that's the latest part of the puzzle here, isn't that an issue of law? I think the court did not. Let me say this. The court did not cite Hodari-D for a lack of citing. The government surely cited that case in its response motion to our motion to suppress. The court was fully aware of Hodari-D for reasons that aren't necessarily clear in its opinion. It disregarded Hodari-D. All I can say is Hodari-D, from what you're telling me, was brought to the court's attention. But was the court ultimately aware when the court made the decision and stated its rationale? We don't have it there. And, therefore, the only thing I can assume is that Hodari-D was not considered at that particular point in time. I think the court was focused more on the unlawfulness of the stop. I agree. Thank you. Thank you. Your Honor, if I may just address a few points. With regard to the question of whether or not Hodari-D only applies in a fleeing felon context, when the initial show of authority is made, three cases that come to mind where those simply aren't the facts, where the defendant in question was actually stationary when the officers presented their show of authority, or at least where the court found that a show of authority had been made, are Coggins, Brown, and Valentine. In all three of those cases, there was no flight until after the show of authority had been made, much like the case before. There are degrees of show of authority. If they get out of their car and say, police, and they show their badges and flash their flashlights, that's a show of authority. If they draw their guns, is that physical force or does physical force require actual touching? What would be a physical force short of actual touching? Your Honor, I think the government's position is that physical force is actual touching, so I don't think there can be an application of physical force without some form of actual touching. That doesn't mean that, for example, in Hodari-D, the examples given by the court, there is some form of grasping or actual touching, I think actual laying on of the hands are the words that are used. So then at Terry's stop, we either have to find that the police touched the person or that the person complied with directives. And short of that, we have no – apart from that, we have absolutely unfettered stopping by police based upon anything imaginable. Well, you would certainly have attempted stopping, is the government's position. In other words, you would – But there is no Fourth Amendment protection from attempted stopping. Correct, Your Honor. So we're limiting Terry to police actually lay on hands or the defendant has to have submitted. Almost entirely, Your Honor. The one exception I would say is that inclusive of application of physical force is not just laying on of the hands, but it would be if, for example, an officer threw something and it hit the defendant. That would also be an application of physical force. But drawing guns maybe right at the person, 10 feet away, not sufficient. Not sufficient, again, under both the Samuels case and the Johnson case. But also I think importantly, if you looked at the dissent in Hodari-D, dissent actually criticizes the majority opinion there by saying, look, under this test that you're fashioning here, an officer does not seize an individual even if the officer fires a gun, if the bullet misses the defendant. Because that would not be an application or a touching, as Hodari-D was referring to. Thank you. We'll take a five-minute break.